UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TRACEY NICOLL** | * | **CIVIL ACTION** |
| | * | |
| **versus** | * | **No. 12-1593** |
| | * | |
| **I-FLOW, LLC** | * | **SECTION "L" (4)** |

## ORDER & REASONS

Before the Court is a Rule 12(b)(6) Motion to Dismiss Plaintiff's Complaint filed on behalf of Defendant (R. Doc. 11). The Court, having reviewed the submitted memoranda and the applicable law, now issues this Order and Reasons.[1]

## I.  BACKGROUND

This case arises out of alleged personal injuries sustained as a result of a defective medical product. Plaintiff Tracey Nicoll filed suit in this Court on June 21, 2012 seeking to recover for injuries relating to two shoulder surgeries. The first surgery, on Nicoll's right shoulder, was performed on March 15, 2007 at East Jefferson General Hospital in Jefferson Parish, Louisiana. The second surgery, on Nicoll's left shoulder, was performed on May 15, 2007 at East Jefferson General Hospital in Jefferson Parish, Louisiana. Following both surgeries, Nicoll's doctor implanted a medical device marketed under the name "ON-Q PainBuster" (the "Pain Pump") into Nicoll's surgically-repaired shoulder. The Pain Pump delivers, via catheter, continuous doses of pain relief medication directly into the operative site and was designed and manufactured by I-Flow, L.L.C. ("I-Flow").

Plaintiff alleges that the Pain Pump injected dangerous doses of medication into both of

---

[1] The Court wishes to acknowledge the diligent work of intern Max Africk, a J.D. candidate at the University of Texas School of Law, in the preparation of this Order and Reasons.

1

his shoulder joints.  As a result, Plaintiff has suffered loss of cartilage, also known as chondrolysis, in both shoulders, requiring multiple surgeries and likely additional medical care. In his complaint, Plaintiff states three causes of action: the Louisiana Products Liability Act (LPLA); Violation of Warranty of Redhibition; and Loss of Consortium.

## II.  PRESENT MOTION

I-Flow filed a Rule 12(b)(6) Motion to Dismiss, asserting that Plaintiff's claims are federally preempted by the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301,  and therefore must fail as a matter of law.  Plaintiff argues that under the Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. § 360c *et seq.*, the Pain Pump is a Class II device that was only subjected to § 510(k) review and therefore, his claims are not federally preempted.

## III.  LAW AND ANALYSIS

### A. Standard of Review

In considering a motion to dismiss under Rule 12(b)(6), the Court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).  However, a pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Therefore, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.  *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

### B. Applicable Law

"The Supremacy Clause of the Constitution prohibits state laws from conflicting with federal law."  *Gomez v. St. Jude Medical Daig Div. Inc.*, 442 F.3d 919, 928-29 (5th. Cir. 2006)

(citing U.S. CONST. art. VI, cl. 2).  Therefore, "[a] 'state law that conflicts with federal law'" is federally preempted and "'without effect.'"  *Id*. at 929 (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)).

Federal preemption "may be either expressed or implied." *Gade v. National Solid Wastes Management Association*, 505 U.S. 88, 98 (1992).  "Absent explicit pre-emptive language, [the United States Supreme Court] has recognized at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is so pervasive . . . that Congress left no room for the States to supplement it, and conflict pre-emption, where [either] compliance with both federal and state regulations is" impossible or "state law stands as an obstacle to the accomplishment and execution of" federal law.  *Id.* (internal quotation marks and citations omitted).

Inevitably, "'[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 106 (1963)).  Congressional intent is primarily "discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it."  *Id*. at 486 (quoting *Gade*, 505 U.S. at 111, 112).  However, the Court should also review the "'structure and purpose of the statute as a whole'" in order to determine "the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law."  *Id*. (quoting *Gade*, 505 U.S. at 98).

The regulatory regime created by the MDA established three levels of "oversight for medical devices, depending on the risks they present." *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 316 (2008).  Class I devices are "subject to the lowest level of oversight" such as "labeling requirements."  *Id*. (citing 21 U.S.C. § 360c(a)(1)(A)).  Class II devices are subject to all of the Class I requirements and additional "'special controls' such as performance standards and

3

postmarket surveillance measures." *Id*. at 316-17 (quoting 21 U.S.C. § 360c(a)(1)(B)).  Class III devices are subject to the "most federal oversight." *Id*.  These devices, including "replacement heart valves, implanted cerebella stimulators, and pacemaker pulse generators," either support or sustain human life, substantially prevent impairment of human health, or present a potentially unreasonable risk of injury or illness.  *Id*. (citing 21 U.S.C. § 360c(a)(1)(C)(ii)).

The Food and Drug Administration ("FDA") subjects all new Class III devices to premarket approval ("PMA"), at which time the "manufacturer must provide the FDA with a 'reasonable assurance' that the device is both safe and effective."  *Lohr*, 518 U.S. at 477 (quoting 21 U.S.C. § 360e(d)(2)).  "Premarket approval is a 'rigorous process,'" and the FDA spends "an average of 1,200 hours reviewing each application."  *Riegel,* 552 U.S. at 317-18 (quoting *Lohr*, 518 U.S. at 477).

However, most Class III devices avoid the PMA process by invoking one of the MDA's two exceptions.  *See Lohr*, 518 U.S. at 477.  The first exception is a "grandfathering" provision that "allows pre-1976 devices to remain on the market without FDA approval" until "the FDA initiates and completes the requisite PMA."  *Id*. at 478 (citing 21 U.S.C. § 360e(b)(1)(A); 21 CFR § 814.1(c)(1)).  The second exception permits Class III devices that are "substantially equivalent" to a pre-1976 device to avoid the PMA process and enter the market through a process referred to as a § 510(k).  *Riegel*, 552 U.S. at 317 (quoting 21 U.S.C. § 360c(f)(1)(A)); *see also Lohr*, 518 U.S. at 477-78.

The § 510(k) process focuses "on equivalence, not safety."  *Id*. at 323.  It takes an average of only 20 hours to complete, requires the manufacturer to submit little information, "'rarely elicits a negative response from the FDA, and gets processed very quickly.'"  *Lohr*, 518 U.S. at 479 (quoting Adler, *The 1976 Medical Amendments: A Step in the Right Direction Needs Another Step in the Right Direction*, 43 Food Drug Cosm. L.J. 511, 516 (1988)).  It is therefore

4

not surprising that "[m]ost new Class III devices enter the market through [the] § 510(k)" process rather than PMA. *Riegel*, 552 U.S. at 317.

The MDA only preempts "state requirements 'different from, or in addition to, any requirement applicable . . . to the device' under federal law." *Id*. at 321 (quoting 21 U.S.C. § 360(k)(a)(1)). The United States Supreme Court has repeatedly rejected the assertion that the § 510(k) approval imposes "device-specific requirements." *See id*. at 322; *see also Lohr*, 518 U.S. at 494. As the Court stated in *Lohr*, "[t]here is no suggestion in either the statutory scheme or the legislative history that the § 510(k) exemption process was intended to do anything other than maintain the status quo with respect to the marketing of existing medical devices and their substantial equivalents. That status quo included the possibility that the manufacturer of the device would have to defend itself against state-law claims of negligent design." *Lohr*, 518 U.S. at 494. Therefore, state law claims involving a medical device approved via the § 510(k) process cannot be federally preempted because the § 510(k) process does not impose any preemptive federal requirements. *See id*.

## C. Analysis

In its Rule 12(b)(6) motion to dismiss, I-Flow cites a number of cases in which courts have ruled that state law claims against medical device manufacturers are federally preempted by the FDCA. However, in every case cited by I-Flow, the medical device was a Class III device that was subjected to the PMA process. *See*, *e.g.*, *Hinkel v. St. Jude Medical, S.C.*, 869 F. Supp. 2d 739 (E.D. La. 2012); *Lemelle v. Stryker Orthopaedics*, 698 F. Supp. 2d 668 (E.D. La. 2010); *Gomez*, 442 F.3d 919. The Pain Pump, on the other hand, is a Class II device that was only subjected to § 510(k) approval. (R. Doc. 16).

I-Flow attempts to devalue this distinction by asserting that the critical inquiry is not whether the device was subjected to the PMA or the § 510(k) process, but rather whether a

5

private lawsuit is seeking to impose requirements that are "different from, or in addition to" federal requirements. However, the United States Supreme Court has repeatedly held that the § 510(k) process does not impose any preemptive federal requirements. *See Riegel*, 552 U.S. at 322; *Lohr*, 518 U.S. at 493-94. In other words, state law cannot be preempted by federal requirements that do not exist.

## IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that I-Flow's Rule 12(b)(6) Motion to Dismiss (R. Doc. 11) is hereby **DENIED**.

New Orleans, Louisiana, this 6th day of June, 2013.

_____
UNITED STATES DISTRICT JUDGE